FIRST NATIONAL BANK, PARIS *v.* MCKEEN.

4-5326                                127 S. W. 2d 142

Opinion delivered March 20, 1939.

*Arnett & Shaw,* for appellant.

*White & White* and *J. M. Smallwood,* for appellee.

GRIFFIN SMITH, C. J. This appeal questions a decree finding that First National Bank at Paris did not have the right to charge appellee's account with certain checks drawn on it by Blue Ribbon Corporation, such checks having been received as part of a deposit with which appellee was credited.

The checks were issued Saturday, February 29, 1936, payable to laborers in mines distant from Paris. Appellee cashed some of the checks. Others were accepted in trade or on account, such transactions having occurred on Saturday at appellee's store. The bank closed at three o'clock. Appellee insists that checks aggregating $776.31, and other checks, were cashed by him just as the bank was closing Saturday afternoon, and that he received $898. Appellant's explanation is that appellee presented the checks Monday, March 2, in connection with a deposit; that an adding machine slip was attached to the deposit ticket, showing a total of $1,515.43 in checks. Five hundred dollars cash was deducted and paid to appellee, whose account was credited with the difference of $1,015.43. It is not clear whether all checks comprising the claim of $776.31 were with the Monday deposit, or some were included in the list cashed Saturday.

It is admitted by Blue Ribbon Corporation's secretary that the checks were issued to workers February 29, but were dated March 2—this for record purposes. If appellee accepted checks February 29 post-dated March 2, he did so with notice. However, the issue was intended for release on the 29th, and if the bank in these circumstances cashed them for appellee, the fact that *prima facie* they were not payable until March 2 is immaterial.

The bank's original ledger sheet, showing Blue Ribbon Corporation's account, reveals that 129 checks were cashed from February 17 to February 28. On the 28th Blue Ribbon's credit balance was $50.64. February 29 $999 was deposited, and $1,498.50 was deposited March 2. Balance at the close of business March 2 was $2,475.80.

The February 29th credit was established through deposit of a check for $1,000 drawn in favor of Blue Ribbon Corporation by United Sales Company of Kansas City, Missouri, less exchange of $1. The $1,498.50 credit resulted from deposit of a $500 check drawn by Independent Lumber & Coal Company, of St. Joseph, Missouri, and a $1,000 check of United Sales Company, less exchange of $1.50. The checks were drawn on Missouri Valley Trust Company, of St. Joseph.

According to appellant's agents, the bank received a telegram from St. Joseph Monday afternoon near four o'clock stating that payment had been stopped on the three checks deposited by Blue Ribbon Corporation. Appellee says he was called by the bank about six o'clock Monday evening (after dark) and was told not to accept any more Blue Ribbon checks—that "something had happened."

Tuesday morning, March 3, appellee received from appellant sixteen Blue Ribbon checks on which appellee had received credit of $776.31.

June 20, 1936, appellant charged to loss $846.61— the difference between the March 2d balance of $2,475.80 and $1,629.19. At the same time, the latter item was charged off. Checks drawn by Blue Ribbon Corporation and cashed by the bank or handled by parties other than appellee made up the loss of $846.61.

The rule supported by the great weight of authority[1] is that when a check is offered for deposit in the bank on which it is drawn, the bank has the right as against such depositor to reject it or refuse to pay it, or to receive it conditionally; but if it unqualifiedly accepts the check and places it to the credit of the depositor, it cannot thereafter, in the absence of fraud or collusion, repudiate the transaction. "The reason for this rule," says American Jurisprudence,[1] "is that the unqualified acceptance of the check constitutes a completed transaction the effect of which is the same as though the check had been paid in cash and cash in turn deposited in the account. As a consequence, as between the bank and the depositor, the former must bear the loss if the check proves to be

---

[1] American Jurisprudence, v. 7, § 457, p. 327.

an overdraft on the drawer's account. The title to the check passes to the bank, which then becomes a debtor for the amount of such check. It is not necessary, in order to complete the credit to the depositor, that the check be debited to the drawer and marked 'paid'."[2]

To the same effect is Corpus Juris Secundum, vol. 9, § 284, at page 592. There it is said that "Where a bank has unqualifiedly accepted and placed to the credit of a depositor a check drawn on itself, it may not thereafter, in the absence of fraud or collusion, repudiate such completed transaction, although a depositor who has suffered no loss through dishonoring of the check may not recover of the bank, and by agreement the right to charge back may be preserved."

A leading case from which the rule seems to have been constructed is *First National Bank of Cincinnati* v. *Burkhardt*, 100 U. S. 686, 25 L. ed. 766, where it was said:

"When a check on itself is offered to a bank as a deposit, the bank has the option to accept or reject it, or to receive it upon such conditions as may be agreed upon. If it be rejected, there is no room for any doubt or question between the parties. If, on the other hand, the check is offered as a deposit and received as a deposit, there being no fraud and the check genuine, the parties are no less bound and concluded than in the former case. Neither can disavow or repudiate what has been done. The case is simply one of an executed contract. There are the requisite parties, the requisite consideration, and the requisite concurrence and assent of the minds of those concerned."

Law of the Burkhardt Case was applied by this court —or, rather, the principle was stated—in *Arkansas Valley Bank* v. *Kelley*,[3] where it was said: "Some innocent person must suffer; and, as the bank's election to treat as a cash deposit the check from Payne by Burroughs, instead of receiving it for collection, as might have been done, caused the loss to fall upon it, the loss must remain there."

---

[2] See list of annotated cases referred to in American Jurisprudence, v. 7, p. 327 [note 5].

[3] 176 Ark. 387, 3 S. W. 2d 53, 58 A. L. R. 808.

In *Rogers Commission Company* v. *Farmers Bank of Leslie*,[4] Mr. Justice Kirby said: "It was not necessary to the bank's liability that it should have on deposit to the drawers' credit more than the amount of the check at the time of its presentation, for it would have become liable to its payment by an acceptance of it, and could have permitted an overdraft as it had usually done, or withheld its own check, which it claimed to have in its drawer against the account of the makers of the check, which latter the testimony indicates it did do."

Appellant insists that the proof, including admissions of appellee, shows it was customary for the bank to accept without question checks drawn by its depositors, and at the close of the day's business to charge back all worthless items.[5]

Blue Ribbon Corporation mines at Scranton, where pay checks were delivered, closed at three o'clock. Appellee customarily cashed such checks because appellant bank closed at three o'clock. Because of simultaneous closing hours, the miners could not get to Paris in time to present their checks at the bank.

Appellee was asked how the bank received his deposit. His reply was that when a deposit was tendered "They checked [the list], and if there was [a check] not good they would hand it back to me."

"Q. Prior [to the time in question] you had deposited checks that were bad, and they brought them back to you, and charged them back to you? A. I have gotten back several small ones, but not the day I deposited them. They would charge them back and deliver them to me—one or two dollar checks. Q. You have had that to arise since this time on several little checks?—

---

[4] 100 Ark. 537, 140 S. W. 992.

[5] On the face of the deposit ticket was printed: "All checks and drafts are credited subject to payment under conditions stated on back of duplicate ticket." On the reverse side of the ticket the following appears: "In receiving items for deposit or collection, this bank acts only as depositor's collecting agent. . . . All items are credited subject to final payment. . . [The Bank] may charge back any item at any time before final payment whether returned or not; also, any item drawn on this bank not good at close of business on day deposited [may be charged back]."

When you deposit a bunch of checks, don't they just look at your indorsement, and if the check is not good they charge it back? A. That is the way they did these. I guess it is the ordinary way the bank handles them.''

This is the strongest testimony tending to prove a custom or practice known to appellee. By this evidence it is sought to raise a legal presumption that the bank conditionally accepted Blue Ribbon checks. If such custom prevailed, it is immaterial whether items comprising the charge-back were cashed on Saturday, or were included in the Monday deposit. If, on the other hand, the right to charge arises solely on account of reservations expressed on the deposit ticket, such right must have been exercised not later than the close of business of the day of conditional acceptance.

Admittedly no checks were charged Saturday, nor was there a debit to appellee's account on Monday. None of the items comprising the claim was charged to Blue Ribbon Corporation's account. Presumably they were carried as cash from Saturday (if appellee's testimony is correct) or from Monday afternoon's closing hour (if appellant's explanation is the proper one) until Tuesday morning. Appellant does not contend appellee was notified Monday that the checks would be charged to him. It is only insisted he was advised not to accept other similar checks.

The evidence is not sufficient to avouch a custom. Appellant insists it relied upon appellee's indorsement; that he was a customer of known responsibility; that his checks were examined only for the purpose of verifying the amounts and the total.

Conspicuous—and we think controlling—is the fact that during all of Monday's banking day, Blue Ribbon's account showed a credit balance of $2,475.80. Not until four o'clock was there any indication, even to the bank, that this balance was synthetic—and this was an hour after doors had been closed. If appellee, or anyone entitled to the information, had asked bank officials at any period of the day if Blue Ribbon checks were good, an affirmative answer would have been given.

The bank elected to treat the foreign checks deposited by Blue Ribbon Corporation as so much cash. It charged $2.50 as exchange for handling them.

There was evidence of a custom whereby Blue Ribbon Corporation would not deposit its out-of-town checks until the pay roll was due. The bank, although having complained of the practice, permitted it.

Miscellaneous checks charged to Blue Ribbon account June 18 were cashed March 2 (or possibly February 29) because appellant elected to treat Blue Ribbon's deposit as an established credit insofar as third parties were concerned.

If the bank had any doubt about the St. Joseph checks, a relatively inexpensive telegraph message or telephone call would have put that doubt at rest. By an expenditure of approximately $1.50 the deposit could have been verified. If custom is to be relied upon, appellee has shown that it was appellant's practice to accept as cash Blue Ribbon's eleventh-hour deposit of foreign checks.

Of those concerned in the case at bar, only the bank had expressed disapproval of the practice of withholding deposits until pay rolls were ready to be released, yet in spite of its apprehension appellant continued to accept the business and to establish credits which Blue Ribbon Corporation was authorized to check against.

Appellee, if forced to sustain the loss, would be a victim of conditions he did not set in motion and over which he had no control. Of course, he could have refused to cash the checks. Extreme prudence might have suggested an inquiry regarding their status; but proof is conclusive that the only answer possible would have been one confirming his own belief that they were good.

The decree is affirmed.

SMITH, FRANK G., McHANEY and HOLT, JJ., dissent.

HOLT, J. (dissenting). I cannot agree with the majority opinion in this case. The effect of it is to say to every bank in this state that when one of them credits a customer's account with a check (or checks) drawn on it, it does so at its peril. In other words, should the bank after having given its customer's account credit

for the check drawn on it, find out, at the close of business, on the same day during which the deposit was made, that there were insufficient funds in the account on which the check was drawn to cover it, then the bank regardless of any custom, or agreement with the customer, would not be permitted to charge the amount of the check back to the account of the depositors, but must assume and pay the amount of this check itself. I do not think this is the law of this state. If it should be and the majority opinion allowed to stand, then Arkansas banks must, of necessity, add new employees and increase the expense of operation to an unprofitable and unjust degree.

The effect of this decision is that when customers, such as large department stores in the larger cities of this state, that accept literally hundreds of checks daily, go to make their deposits, the bank teller, before crediting the grand total of these checks on the passbook of this depositor, must leave his cage, go back to the bookkeeper and ascertain whether each one of these hundreds of checks is good. This might conceivably take hours while the line of customers waited. Such a rule would, in my opinion, paralyze banking and is not the law of this state.

The facts in the instant case disclose that appellee, a graceryman at Paris, Arkansas, had for a number of years on Saturday afternoon, after banking hours, cashed a large number of checks for coal miners in that neighborhood who held checks drawn on the Blue Ribbon Corporation's account in appellant bank. This practice of appellee was not only to accommodate these employees in cashing their checks, but naturally we must assume that it was good business on his part for the reason that a large number of these coal miners would spend the proceeds of these checks with appellee in the purchase of merchandise. I think the undisputed proof shows that twelve of the sixteen checks in question were cashed by appellee on a Saturday and deposited with appellant bank on the following Monday, March 2, and the great weight of the testimony shows that the other

four checks were deposited on the same day. The evidence also shows that it was the custom of appellant bank to accept checks drawn on it, for deposit when offered by appellee, and at the close of business on the same day the deposit was made, to charge back to appellee's account any and all checks that were not good, and that appellee understood and agreed to this custom cannot be doubted.

The uncontradicted evidence also shows that within the passbook in which appellee's deposits were entered with appellant bank, and on the face of the deposit ticket used by appellant, was printed the following contract and agreement between appellant and appellee: "All checks and drafts are credited subject to payment under conditions stated on back of duplicate ticket." On the reverse side of the ticket the following appears: "In receiving items for deposit or collection, this bank acts only as depositor's collecting agent . . . . All items are credited subject to final payment. (The Bank) may charge back any item at any time before final payment whether returned or not; also, any item drawn on this bank not good at close of business on day deposited (may be charged back)." Appellee had been doing business with appellant bank for more than ten years and as to the custom under which such business was done, referred to above, I think appellee's own testimony settles that issue. We quote from the record his own words, as follows: "A. I have got back several small ones, but not the day I deposited them. Q. When would you get them? A. Afterwards. Q. They would charge them back to you and deliver them back to you? A. One or two dollar checks. Q. You have had that to arise since this time on several little checks—when you deposit a bunch of checks don's they just look at your indorsement and if the check is not good they charge them back? A. That is the way they did these. Q. That is the ordinary way of handling checks on that bank, isn't it? A. I guess it is."

Not only does appellee admit the custom which had sprung up between him and appellant, but states further

that he even permitted appellant to return checks afterwards and accept these charges against his account after the close of business on the day of deposit. The size of the checks in proving custom can be of no consequence. The fact remains that appellee did permit these checks to be charged back to his account. I think that we cannot, and should not, say that the day's business in any bank in this state ended at three o'clock in the afternoon or at any other hour when its doors were closed to the public on that day. Certainly there must be additional time given to the bank and its employees to check through its daily business and determine the status thereof. It may be said to be a matter of common knowledge that a large part of the bank's business is performed after its doors are closed.

Of course, if appellant bank intended unqualifiedly to accept these sixteen checks in question when deposited by appellee on March 2, then appellee would be entitled to recover; on the contrary if appellant intended to accept these checks only on condition of their payment, then appellant should not be held liable for their payment.

We think the rule of law governing the instant case to be as stated in Corpus Juris, Vol. 17, § 24, titled "Customs and Usages", wherein the text-writer said:

"The better authority seems to support the rule that the established usage of a bank is binding on persons dealing with it whether they have actual knowledge thereof or not, particularly where it has been so long established that its customers may well be presumed to have known of it, where they have had previous dealings with the bank, or where it is a general custom among the banks of the place; but there are numerous decisions more in consonance with the general rules relating to usages which hold that the usage of a particular bank will not bind the party dealing with it, unless he has express knowledge of it. Other authorities hold that as in other cases a banking usage must either be known or so well established as to raise the presumption that it was known."

In *Townley* v. *Exchange National Bank of Tulsa,*
108 Okla. 144, 234 P. 574, under facts similar to the
instant case, the rule is stated by the court as follows:
"On accepting a deposit, that the law usually creates the
relation of debtor and creditor is not in dispute in this
case, and that, when such deposit is made in the form
of a check drawn upon the bank by another depositor
and there is no want of good faith on the part of the
depositor, the giving of the depositor of credit to the
amount of the check precludes the bank from recall-
ing or repudiating the credit. 3 R. C. L. 153; 7 C. J.
635; (and other citations). On the strength of the
same authorities, we think that it is equally well
settled that such acceptance, to constitute this relation
of debtor and creditor as set out above, must be an un-
conditional one, and *that where a custom is known to a
depositor, or so well established it should be known to
him,* such checks are accepted by the bank on condition
that an examination of the drawee's account discloses
sufficient credit to warrant the payment of the check
by the bank, that such conditional acceptance, under said
custom, does not create the relation of debtor and cred-
itor until the custom has spent itself, and the bank has
had the opportunity to determine whether the check
should be honored or charged back against the deposit
of the customer.

In the case of *Pollack* v. *National Bank of Commerce,*
168 Mo. App. 368, 151 S. W. 774, it was said: 'Where a
depositor of a bank presented to it a check for deposit,
with knowledge of the custom of the bank to take checks
and defer payment for a reasonable time until the bank
ascertained whether there were sufficient funds of the
drawer to pay it, the depositor was estopped from as-
serting that the bank, giving him credit for the deposit,
could not, on finding insufficient funds to pay the checks,
charge the depositor's account with the amount thereof.'
That such custom and established usage on the part of
the defendant bank, as well as other banks in the city
of Tulsa, existed was known to the plaintiff or should
have been known to him, was the defense pleaded by
the bank. The defendant bank further pleaded that on

the passbook of the plaintiff on which he received the credit was printed: 'Checks on this bank will be credited conditionally. If not found good at the close of the day of deposit, they will be charged back to depositors, and the depositor notified, etc. . . .' That such custom or usage as to such checks obtained was shown by the evidence, not only in the conduct of the business of the defendant bank, but in the other banks of said city.''

See, also, *First Nat. Bank* v. *Burkhardt,* 100 U. S. 686, 25 L. Ed. 766, wherein the court said: ''If the check were to be considered as received on deposit when it was left with the teller, and Cannamon was the debtor of the bank and the bank his creditor from the time, then the transaction was not within the guaranty, and Burkhardt was not liable. If, on the other hand, the bank had the right to hold the check until after banking hours, and then to make its election, and to credit the depositor and charge Cannamon with the amount, as was done, the check was covered by the guaranty, and the bank was entitled to recover.''

On this same question of custom in the case of *Bank of Charleston* v. *Hill,* 177 Ark. 1138, 9 S. W. 2d. 1064, this court held, as is shown by the third headnote, as follows: ''Where the banking custom, in the absence of a special agreement, was to receive checks for collection only, to be recharged in the event of collection not being made, though credit was given to the depositor at the time of the deposit, the presumption would be that the bank and depositor contracted with reference to this custom.''

Since, therefore, the uncontradicted proof in this case shows the existence of, not only a custom between appellant and appellee to charge back the checks in question, but also a written agreement clearly giving this right to appellant, it is my view that this case should be reversed, and, since it appears to have been fully developed, dismissed.

I am authorized to say that Justices Smith and McHaney concur in this dissent.